

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-047-CV

IN THE INTEREST OF V.S.R.K., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I.    Introduction

Appellant Johnny D., the alleged biological father of V.S.R.K., appeals the trial court's order terminating the parent-child relationship between himself and V.S.R.K.  Following a bench trial, the trial court found that Appellant failed to assert paternity in accordance with family code section 161.002; that Appellant knowingly placed or knowingly allowed V.S.R.K. to remain in conditions that endangered her well-being; that Appellant engaged in conduct or knowingly

---

[1] *See* Tex. R. App. P. 47.4.

placed V.S.R.K. with persons who engaged in conduct that endangered her well-being; and that Appellant constructively abandoned V.S.R.K. In four issues, Appellant challenges the legal and factual sufficiency of the evidence supporting each of these findings. We affirm in part, reverse and render in part, and remand for further proceedings.

## II.    The Children, Parents, and Trial

Chessica K. is the biological mother of ten-year-old V.S.R.K. and her two half-sisters, S.S. and F.L.S. (ages eight and six, respectively). Appellant is V.S.R.K.'s alleged biological father. Tracy S. is S.S. and F.L.S.'s biological father. This appeal concerns only the relationship between Appellant and V.S.R.K.

In August 2006, Chessica and her sister referred the children to the Department of Family and Protective Services ("the Department") because they both felt they were incapable of caring for the children. The children are currently in a foster home. The Department initiated termination proceedings against Chessica, Appellant, and Tracy. The case was tried to the bench on January 16, 2007.

**A.    Chessica**

Chessica did not attend the trial.  Bethany Hooser, a Department investigator, testified that Chessica had referred the children to the Department because "she did not feel she was capable of caring for the children. . . . She didn't have a place to live, she had some health concerns, she had some mental health issues, some past drug issues.  Finances were a concern for her." Jeannette Leong, a Department specialist, testified that Chessica's contacts with the Department concerning the children were infrequent and that the content of her communications with the Department was that she desired to relinquish her rights to the three children.  In its order, the trial court found that Chessica had constructively abandoned the three children and that termination was in their best interests.

**B.    Tracy**

Tracy testified at trial.  He stated that although he is not V.S.R.K.'s biological father, she "started calling me Daddy within around 2000 and she's called me Daddy ever since."  He testified that he had previously been incarcerated for a probation violation relating to four charges of battery to a household member.  Tracy also said that he had two prior convictions for possession of marihuana.  He stated that he had been fired from his last job

3

because drugs were found in his work truck. Tracy said that he currently lived in his truck.

Hooser testified that there were concerns over placing the three children with Tracy because "the children had previously lived with [Tracy], and there were concerns that he had been physically abusive and that he had used drugs and was not able to provide what would be considered a safe home for the children." The record indicates that there were also allegations Tracy had sexually abused S.S. Leong testified that Tracy had been in and out of drug treatment for methamphetamines, that he was unemployed, and that he did not have a place to live. After the majority of testimony concerning Tracy concluded, Tracy submitted affidavits relinquishing his parental rights to S.S. and F.L.S. The trial court accepted the affidavits.

C.    Appellant

Appellant is incarcerated and is serving an eight-year sentence for evading arrest. The Department alleged that Appellant is V.S.R.K.'s biological father. Appellant filed a general denial and a request for appointment of counsel, in which he stated, "I am the parent of the child named above [V.S.R.K.]." The Department developed a service plan for Appellant, calling for Appellant to complete a number of services "upon his release." V.S.R.K.'s ad litem

4

requested DNA testing to determine whether Appellant was V.S.R.K.'s father, but the test results were not available at the time of trial.[2]

The reporter's record contains surprisingly little information about Appellant. Wendy Hackler, Appellant's appointed attorney, informed the trial judge that Appellant would not attend the trial because he was incarcerated. She also stated that she had filed a motion for continuance and a motion for severance because Appellant had not received DNA results showing whether he was V.S.R.K.'s biological father. The trial court denied the motion. When asked about Appellant, Tracy testified, "I've never seen him, never met him." Hooser's testimony regarding Appellant was that Chessica had informed her that Appellant was V.S.R.K.'s biological father and that he was incarcerated. Shana Hazzard, the foster home director for the home where the children currently live, testified that she had not had any contact with Appellant.

The most extensive testimony concerning Appellant came from Leong. Leong testified that she had spoken with Appellant's brother about placing the children with him, but he was willing to take only V.S.R.K., and the Department felt it was important to keep the three children together. She said that she had

---

[2] In Appellant's brief, his counsel states that he has been advised by the Department's counsel that the DNA test shows that Appellant is V.S.R.K.'s biological father.

5

corresponded with Appellant via letters. She testified that she had set up a service plan for Appellant, that he had been incarcerated the entire time the children have been with the Department, and that she had kept him apprised of the case. She stated that Appellant had "not sent me any certificates or any notification of completion of services" regarding the service plan and that Appellant had not seen V.S.R.K. "face-to-face" during the time the children had been referred to the Department and trial. She did say, however, that the "facility he was in . . . would not allow a conference call with the Child Advocate and myself and [Appellant]." When asked whether he could provide a safe place for V.S.R.K., she replied, "I have no knowledge of what he can provide." She also said that she was unaware of his release date. She also testified that Appellant should have rights to V.S.R.K., but she did not elaborate. She stated that V.S.R.K. referred to Tracy as her dad, not Appellant. She said that she believed V.S.R.K. was aware of Appellant because "I think . . . her mother has told her that [Appellant is] her biological father."

The Department offered exhibits showing that Appellant has two convictions for evading arrest and is currently three years into an eight-year sentence on the second conviction.

**D.    DNA Testing**

Leong testified that conversations with Appellant concerning DNA testing had been "going on for quite some time" prior to trial.  She said that DNA testing had been ordered by the court.  But when asked why Appellant had not been tested previously and why the results were still not available, she said,

> Well, the DNA test for [V.S.R.K.] occurred in November because I took her down for the test and she was tested, and in my follow-ups with the liaison for the Attorney General's office, evidently they misunderstood where [Appellant] was, because they had sent me an e-mail saying he was a no-show for his test, and I had it very clearly stated the location of the prison facility that he's at, and they immediately came back and said yes, and that's when they were scheduling him for testing, because I took [V.S.R.K.] in November to be tested.

Leong also said that Appellant had been tested ten days prior to trial, that the results were not yet available, and that the delay in getting Appellant tested was "a mistake."  She testified that there had been a report that Chessica's brother might actually be V.S.R.K.'s biological father.  But Leong testified that Chessica had named Appellant as V.S.R.K.'s alleged biological father.

**E.    The Trial Court's Decision**

During the course of the trial, the trial court took judicial notice of a "Certificate of Paternity Registry" that was on file with the court indicating that a diligent search of the paternity registry had been made and that no notice of intent to claim paternity had been located pertaining to V.S.R.K.  In its order of

7

termination, the trial court found that Appellant is V.S.R.K.'s alleged biological father and that he had failed to assert paternity. As grounds for termination, the trial court found that Appellant knowingly placed or knowingly allowed V.S.R.K. to remain in conditions that endangered her physical and emotional well-being; engaged in conduct or knowingly placed her with persons who engaged in conduct that endangered her physical or emotional well-being; and constructively abandoned her. The trial court further found that termination was in V.S.R.K.'s best interest and terminated Appellant's rights.

## III. Discussion

### A. Admission of Paternity

In his first issue, Appellant argues that the trial court erred by finding that he failed to admit paternity under chapter 160 of the Texas Family Code. We agree.[3]

Section 161.002(b)(1) of the family code provides that "[t]he rights of an alleged father may be terminated if . . . after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for

---

[3] In its brief, the Department represents that Appellant concedes in his brief that he did not make an admission of paternity. In fact, Appellant merely conceded that he did not file an assertion of paternity with the paternity registry. The Department also represents that Appellant "refused" to admit paternity, but as we discuss below, this representation is not supported by the record.

8

paternity under Chapter 160." Tex. Fam. Code Ann. § 161.002(b)(1) (Vernon 2008). Subsection 161.002(b)(1) allows the Department to summarily terminate the rights of an alleged biological father who does not assert his paternity. *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.). However, if the alleged father files an admission of paternity or otherwise claims paternity, then the alleged father is able to stave off summary termination of his rights, and the Department must instead meet the high burden of proof found in section 161.001. Tex. Fam. Code Ann. § 161.002(a); *Phillips*, 25 S.W.3d at 357.

This court has held that there are no formalities that must be observed for an admission of paternity to be effective. *In re K.W.*, 138 S.W.3d 420, 430 (Tex. App.—Fort Worth 2004, pet. denied); *see also Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 105 (Tex. App.—Houston [1st Dist.] 2006, no pet.)*; Estes v. Dallas County Child Welfare Unit of Tex. Dep't of Human Servs.*, 773 S.W.2d 800, 802 (Tex. App.—Dallas 1989, writ denied); *In re D.D.S.*, No. 02-05-00313-CV, 2006 WL 2309813, at *2 (Tex. App.—Fort Worth Aug. 10, 2006, no pet.) (mem. op.).

In *K.W.*, the alleged father desired to prove his paternity, and this court held that letters written to the trial court stating he was the child's father alone

were sufficient to constitute an admission of paternity under this section. 138 S.W.3d at 430.

Similarly, in *Estes*, which was decided under a former but substantively similar statute, the State filed a petition to terminate the parental rights of a father who was in prison. 773 S.W.2d at 801. Two weeks before the final termination hearing, the father filed a pro se answer, alleging that he was an indigent parent and requesting the appointment of an attorney. *Id*. The court stated that "[t]here is no provision in the Texas Family Code that specifies any particular form or language required for an admission of paternity." *Id*. The court noted that "the natural rights existing between a parent and child are of constitutional dimensions" and that "involuntary termination proceedings must be strictly scrutinized." *Id*. at 802 (*citing Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). The court, applying strict scrutiny, stated that the father's answer constituted an admission of paternity and that the answer "was timely filed since it was filed prior to the final hearing in the suit for termination." *Id*.

The court in *Toliver*, also applying strict scrutiny to section 161.002, held that despite the alleged father having failed to file any documents with the trial court, his appearing at trial before his rights were terminated and admitting that he was in fact the child's father, triggered his right to require the Department

10

to prove that he engaged in one of the types of conduct listed in section 161.001(1). 217 S.W.3d at 105.

In this case, Appellant has filed a general denial, claimed indigence, and filled out a form requesting counsel stating that he is the father of V.S.R.K. He has also asked to be tested to determine whether he is V.S.R.K.'s biological father.

The Department argues that "in his pleadings and argument at trial, Appellant repeatedly asserted he questioned" his paternity. Thus, the Department argues, he could not have admitted paternity for purposes of 161.002. We are not persuaded by this argument. Appellant filed a motion for continuance asking the trial court to await the results of DNA testing to establish his paternity. The record indicates that the DNA results had been delayed due to "mistake[s]" by the State, not Appellant. More importantly, the record indicates that Appellant admitted paternity in manners that even the Department concedes this court has recognized as admissions of paternity under 161.002.

Because we are required to strictly construe involuntary termination statutes in favor of the parent, we conclude that Appellant admitted his paternity of V.S.R.K. for purposes of section 161.002(b)(1). *See In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.); *see also Holick*,

11

685 S.W.2d at 18, 20–21.  Therefore, the Department was not entitled to summary termination of Appellant's parental rights under family code section 161.002(b)(1), and we will review the trial court's findings on the grounds for termination.

**B.      Grounds For Termination**

**1.      Standard of Review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code. Ann. § 161.206(b) (Vernon 2008); *Holick*, 685 S.W.2d at 20.  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *E.M.N.*, 221 S.W.3d at 820.

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination

12

is in the best interest of the child. Tex. Fam. Code. Ann. § 161.001 (Vernon 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code. Ann. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must

13

review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

If we determine that no reasonable factfinder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must generally render judgment for the parent. *J.F.C.*, 96 S.W.3d at 266; *see* Tex. R. App. P. 43.3.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our

14

own.  *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child.  *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.  If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding.  *J.F.C.*, 96 S.W.3d at 266–67.

### 2. Endangering Conduct

In his second issue, Appellant argues that the evidence is legally and factually insufficient to support the trial court's finding that he engaged in conduct or knowingly placed V.S.R.K. with persons who engaged in conduct that endangered her physical or emotional well-being.  *See* Tex. Fam. Code Ann. § 161.001(1)(E).  We agree.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex. App.—Dallas 1995, no writ). Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).

Endangerment, as that term is used in the statute, means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Although endangerment requires more than a mere threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id.*; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

16

Nonetheless, the evidence of endangerment must be the "direct result of the parent's conduct." *In re D.T.*, 34 S.W.3d at 634. The fact of "imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533 (but noting that "imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment"). Furthermore, to determine whether termination is necessary, courts look to parental conduct engaged in both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

In this case, there is no evidence that Appellant engaged in conduct or knowingly placed V.S.R.K. with persons who engaged in conduct that endangered her physical or emotional well-being. In its brief to this court, the Department points out that Appellant has two prior convictions for evading arrest—one for which he is now incarcerated. The Department also points out that Appellant has not seen V.S.R.K. since she was ten months old. But then the Department focuses the majority of its analysis on Chessica's and Tracy's endangering conduct. The Department fails to show how the endangerment was the "direct result of" Appellant's conduct or that Appellant knew that Chessica and Tracy engaged in endangering conduct. *See In re D.T.*, 34 S.W.3d at 634.

17

We conclude that the trial court could not have reasonably formed a firm belief or conviction that Appellant—as a direct result of his actions—engaged in a voluntary, deliberate, and conscious course of conduct or knowingly placed V.S.R.K. with persons who engaged in conduct that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *In re D.T.*, 34 S.W.3d at 634. We sustain Appellant's second issue.

### 3. Endangering Environment

In his third issue, Appellant contends that the evidence presented at trial was legally and factually insufficient to support the trial court's endangering-environment finding. *See* Tex. Fam. Code Ann. § 161.001(1)(D). We agree.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. *Id*. Under subsection (D), it is necessary to examine evidence relating to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The phrase "conditions or surroundings" refers only to the acceptability of the child's living conditions and does not concern the parent's conduct toward the child. *In re D.J.J.*, 178

18

S.W.3d 424, 429 (Tex. App.—Fort Worth 2005, no pet.). The Department must show that the child's living conditions pose a real threat of injury or harm. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). Although the parent need not have certain knowledge that an actual injury is occurring, there must be evidence that the parent was at least aware of the potential for danger to the child and disregarded that risk. *Id.*

In this case, there is simply no evidence that Appellant *knowingly* placed or *knowingly* allowed V.S.R.K. to remain in conditions or surroundings that endangered her physical or emotional well-being. There is no evidence that Appellant was aware of a potential for danger to V.S.R.K. and disregarded that risk. There is some evidence that Chessica and Tracy's home was a dangerous environment, but the record is devoid of evidence tending to show that Appellant knew anything about their home or its conditions. In the absence of endangering-environment evidence, the Department once again falls back on the fact of Appellant's incarceration, but incarceration alone is insufficient to support termination under subsection (D). *See In re S.M.L.*, 171 S.W.3d 472, 478–79 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

We hold that the trial court could not have reasonably formed a firm belief or conviction that Appellant knowingly placed or knowingly allowed V.S.R.K. to remain in conditions or surroundings that endangered her physical or

19

emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *S.M.L.*, 171 S.W.3d at 478. We sustain Appellant's third point.

### 4. Constructive Abandonment

In his fourth issue, Appellant argues that the evidence is legally and factually insufficient to support the trial court's finding that he constructively abandoned V.S.R.K. *See* Tex. Fam. Code Ann. § 161.001(1)(N). We agree.

The elements of constructive abandonment are (1) the child has been in the permanent or temporary managing conservatorship of the Department for not less than six months, (2) the Department has made reasonable efforts to return the child to the parent, (3) the parent has not regularly visited or maintained significant contact with the child, and (4) the parent has demonstrated an inability to provide the child with a safe environment. *Id*. If there is no evidence of one or more of these elements, then the finding of constructive abandonment fails. *See id*. The first element is not disputed; therefore, we will focus on the remaining three elements of constructive abandonment.

Returning a child to a parent, under section 161.001(1)(N), does not necessarily mean that the child has to be physically delivered to the individual. *See In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.). "Reasonable efforts" to reunite parent and child can be satisfied through the

preparation and administration of service plans. *See id*. at 570–72; *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.).

In this case, Leong testified that she had set up a service plan for Appellant but also testified that Appellant had not sent any certificates or any notification of completion of services. Leong did not elaborate on the details of the service plan and what was entailed. Leong did state, however, that the "facility [Appellant] was in . . . would not allow a conference call" between her and Appellant. Appellant's service plan required him to complete services but not until his release from prison. There is nothing in the record to indicate that Appellant failed to cooperate with the Department. In fact, there is evidence that the Department's attempts to communicate with Appellant were thwarted by the facility where he was incarcerated and that Appellant's attempts to determine his paternity where thwarted by mistakes by the Department. While there is no evidence in the record that Appellant made any attempts to visit V.S.R.K., or to arrange visitation, there is also no evidence that he failed to make any such attempts. We hold that no reasonable factfinder could form a firm belief or conviction that the Department has made *reasonable* efforts to return V.S.R.K. to Appellant. *See J.F.C.*, 96 S.W.3d at 265–66.

There is also no evidence to establish the third element of constructive abandonment. To the contrary, there is evidence in this case that Appellant

21

sent letters to the caseworker concerning V.S.R.K. and that he has corresponded with both the Department and the Child Advocate. There is also evidence in the record that the Department's attempts to communicate fully with Appellant were thwarted by the facility where he is incarcerated. The record does not support the trial court's finding that Appellant did not attempt to visit regularly or maintain significant contact with V.S.R.K. What the evidence in the record supports is that Appellant is incarcerated. We reiterate that incarceration, alone, will not support a finding of constructive abandonment. *See K.W.*, 138 S.W.3d at 432.

Turning to the last element, nothing in the record indicates that Appellant has demonstrated an inability to provide V.S.R.K. with a safe environment. In fact, when questioned about Appellant's ability to provide V.S.R.K. with a safe environment, Leong testified, "I have no knowledge of what [Appellant] can provide." Construing the evidence in the light most favorable to the trial court's judgment, we hold there is no evidence from which a factfinder could reasonably form a firm belief or conviction that Appellant constructively abandoned V.S.R.K. while she was in the care of the Department. *See In re K.W.*, 138 S.W.3d at 432. We sustain Appellant's fourth issue.

22

**IV.     Conclusion**

Having sustained each of Appellant's issues, we reverse the portion of the trial court's order that terminates Appellant's parental rights, render judgment that the Department take nothing on its claim seeking to terminate Appellant's alleged parental rights, and affirm the remainder of the trial court's order.[4] We remand this case to the trial court for further proceedings in light of the results of Appellant's DNA paternity test and, if appropriate, consistent with the establishment of the parent-child relationship between Appellant and V.S.R.K.

ANNE GARDNER
JUSTICE

PANEL:  CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

CAYCE, C.J. concurs without opinion.

DELIVERED:  March 19, 2009

---

[4] Appellant does not challenge the portion of the trial court's order appointing the Department as permanent managing conservator of V.S.R.K.

23